UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PARCEL MANAGEMENT AUDITING AND CONSULTING, INC., <br>           Plaintiff, <br><br> v. <br><br> DOONEY & BOURKE, INC. and RICHARD CERQUEIRA, <br>           Defendants. | No. 3:13-cv-00665 (JAM) |

**RULING RE MOTIONS FOR SUMMARY JUDGMENT**

This is a "whodunit" of a contract case. One of the defendants—Dooney & Bourke, Inc. ("Dooney")—is a Connecticut company that sells high-end fashion accessories such as leather handbags and satchels. It has a lively internet presence and mail-order clientele. The plaintiff—Parcel Management Auditing & Consulting, Inc. ("PMAC")—worked with and advised Dooney on how to reduce its shipping costs.

PMAC claims that Dooney breached a contract to pay it for advisory services rendered to Dooney to reduce Dooney's shipping costs with United Parcel Service ("UPS"). There is a written agreement that purports to be a contract between PMAC and Dooney. The twist in this case is that the contract was signed by a peripheral Dooney employee—defendant Richard Cerqueira—rather than by anyone from Dooney's management. The core of the parties' dispute is whether Cerqueira's signature creates an enforceable contract and, if so, who may be held liable.

Cerqueira moves for summary judgment, contending that he may not be held personally liable on the basis of a contract that he signed on behalf of Dooney. Meanwhile, PMAC also

moves for summary judgment, contending that no genuine issue of fact remains to prevent judgment in its favor on all its contract and related claims. For the reasons below, I grant Cerqueira's motion for summary judgment (Doc. #49), and deny PMAC's motion for summary judgment (Docs. #53, #81).

## BACKGROUND

PMAC helps customers manage their shipping costs through "auditing of customer's third party shipping invoices to ensure correct monthly billing, analysis of internal shipping patterns to improve on internal efficiencies, and contract analysis and negotiation consulting." Doc. #1 (Compl.) ¶ 6. In late 2006, PMAC and Dooney entered into an auditing and consulting agreement, pursuant to which PMAC has since been auditing invoices received by Dooney from its third-party shippers in order to help Dooney recover refunds from invoicing errors. In exchange, PMAC receives a percentage of those refunds. The negotiations for that agreement took place between PMAC's president Richard Michals and Dooney employee Terry Reiss. After Reiss retired, PMAC worked with Dooney's comptroller Kathleen DeMoise and accounts payable clerk Beverly Langer to fulfill the terms of their auditing agreement.

In September 2012, Michals contacted DeMoise and Langer with an email stating the following: "I was also doing some analysis and feel that your current UPS agreement has fallen out of favor and needs a new facelift. Who would be the person to discuss this with? I hope you both! ☺" Doc. #52-10 at 2 (emoji in original). Langer responded: "I think Kathy [DeMoise] would be the one to discuss this with, or Rich Cerqueira. Kathy is on vacation till [sic] Monday. I will bring this up with her and let you know the outcome." *Ibid.* Richard Cerqueira is a computer programmer who since 2012 has worked part time for Dooney, primarily out of his home in South Carolina. Doc. #58 at 1; Doc. #74-2 at 2; Doc. #77-1 (Kinsley Aff.) at 3.

The following Tuesday, when he had not yet heard the "outcome," Michals emailed Langer again, asking for Cerqueira's number. On Thursday, before Michals received any response to that email, he somehow tracked down Cerqueira's telephone number and spoke with him, then followed up on their conversation with an email, which attached a scope-of-work agreement ("Dooney and Bourke Project Bags.pdf") and stated the following:

> It was good talking to you this morning. Attached is the SOW for Dooney.
>
> We only get paid if we save you $$. I am looking forward to reviewing all Dooney shipping data and giving you an intense look at the carrier's [sic] and what they see when they see your shipping personality.
>
> We will talk next week when we have some preliminary analysis. Please reach out to me with any questions. You can get this SOW back to . . . .

Doc. #52-12 at 2.

The attached agreement provided that PMAC would help Dooney favorably renegotiate its shipping contracts with its parcel carriers. In return, over the following three years, Dooney would retain 75% of the cost reductions in its new shipping services, and PMAC would collect 25% of Dooney's savings. *Id.* at 4. Cerqueira signed his name to the agreement, with the title "Prog[rammer]/Anal[yst]," and emailed the signature page back to PMAC with the new name "PMAC contract.pdf." Doc. #52-14 at 2, 4.

In mid-October 2012, PMAC and Dooney employees held a meeting. Before the meeting, DeMoise asked Michals via email whether the meeting would be to "go over the UPS contract suggestions," and she referenced "the last time we went over the UPS contract." Doc. #52-15 at 5. Michals responded that they would be discussing the contract, and that he would have "some intense analysis" to "demonstrate where big savings can be addressed." *Id.* at 4. The reminder email for the meeting was sent from DeMoise (who would not be attending the meeting) to

Michals and Langer (who DeMoise said "d[id] not really need to be part of the meeting") and copied to Cerqueira and several other Dooney employees. *Id.* at 3–4.

The day before the meeting, Michals sent Cerqueira some "very preliminary reports for your analysis and negotiations"—a 72-page spreadsheet—and indicated that he was looking at additional data, so there would be "[t]ons more to come!" Doc. #52-18. Cerqueira forwarded that information to the others who would be at the meeting, stating that "[e]veryone should review" the information for the meeting. Doc. #52-19 at 2.

At the meeting, PMAC distributed "further written and oral analysis and recommendations to Dooney," Doc. #52-5 ¶ 25; Doc. #77 ¶ 25, including a handout analyzing Dooney's "shipping profile" and providing suggestions to improve its contract with UPS. Doc. #52-24. Immediately after the meeting, Michals sent Dooney employees an email with what appears to be a sample email to UPS to open renegotiations, and a chart of additional data. Doc. #52-23.

The day after the meeting, several Dooney employees, including Cerqueira, met with UPS. Doc. #73-3 ¶ 30; Doc. #65 ¶ 30. The parties disagree about whether Dooney employees utilized the materials and information provided by PMAC in their negotiations. *See* Doc. #73-3 ¶ 31; Doc. #65 ¶ 31. But after Dooney received a proposal from UPS, Dooney forwarded it to PMAC for analysis and advice, so that PMAC could review it and share its suggestions. Doc. #52-28 at 4; Doc. #73-3 ¶ 36; Doc. #65 ¶ 36. Michals quickly responded by pointing out an error UPS made that would overcharge Dooney, and offering to talk. Doc. #52-28 at 2. They did talk the next day, and further strategized about the UPS negotiations. Doc. #52-29.

The following month, December 2012, Dooney entered into a new agreement with UPS, which saved them a considerable amount over their previous agreement with UPS. But Dooney

had stopped responding to Michals's inquiries regarding the status of the negotiations or terms of the new agreement. In January 2013, Cerqueira sent Michals the new UPS contract. Doc. #52-30. Over the next three months, PMAC invoiced Dooney for $40,217.06, or 25% of "contract savings." Doc. #52-5 ¶ 45; Doc. #77 ¶ 45.

Dooney did not pay these invoices. To the contrary, Langer expressed to PMAC her deep confusion about them:

> I hate to sound dumb, but I'm trying to figure this all out before I bring these to be signed (by someone). We'll be getting two invoices per month now? Or is this a Dec/Jan invoice only for Contract Savings? One for the same that we got last year with the breakdown for the three locations? One for the Contract savings? I'm asking, because I'm so confused on all of this and with the contract saving invoices I can not make heads/tails out of it.
>
> I really hate to hang you all up on these invoices, but with out [sic] Kathy to sign off on them, I just have to let them wait. Thank you for any help you can give me[.]

Doc. #52-35 at 2. At no point prior to the litigation did Michals or anyone else at PMAC mention to Dooney the existence of the agreement that had been signed by Cerqueira.

In May 2013, PMAC sued Dooney and Cerqueira for breach of contract, unjust enrichment, *quantum meruit*, breach of implied contract, account stated, promissory estoppel, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). Cerqueira now moves for summary judgment in his favor on all claims against him (Doc. #49), and PMAC cross-moves for summary judgment in its favor on all claims against both defendants (Docs. #53 (sealed), #81 (redacted)).

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## Cerqueira's Motion for Summary Judgment

### *Breach of Contract and Implied Contract*

Cerqueira moves for summary judgment on PMAC's contract claims. In order to establish liability for breach of contract or breach of implied contract, a plaintiff must show (i) the formation of an agreement, (ii) performance pursuant to it by one party, (iii) breach by another party, and (iv) damages. *Hawley Ave. Assocs., LLC v. Robert D. Russo, M.D. & Assocs. Radiology, P.C.*, 130 Conn. App. 823, 832, 25 A.3d 707 (2011) (breach of contract elements); *Mahon v. Chicago Title Ins. Co.*, 296 F.R.D. 63, 78 (D. Conn. 2013) (same elements for breach of implied contract).

Cerqueira is clearly entitled to summary judgment for lack of a genuine issue that PMAC formed or entered into an agreement with him personally. "An individual is only personally liable for performing a contract which he signed in his individual capacity and is not liable for a

contract which he signed in his representative capacity as an officer of a corporation or other non-natural person." *Drinks, Inc. v. Walker*, 2005 WL 1757957, at *2 (Conn. Super. Ct. 2005) (Bryant, J.); *see also Marron & Sipe Bldg. & Contracting Corp. v. Flor*, 22 Conn. App. 689, 699, 580 A.2d 508 (1990) (directed verdict appropriate in favor of individuals sued for breach of contract, where those individuals signed the contract in their representative—not individual—capacities, because the only contractual relationship was between the corporate parties).

> [W]here the corporation appears as the primary signer, the almost universally accepted and reasonable rule of construction is that where the signature is that of the corporation, and the name or names of one or more of its officers in their official capacity are appended as subscribing agents . . . the corporation will be regarded as the signer and obligor, and the individuals will not be obligated, unless other language or the general tenor of the writing indicates a contrary intent.

*LucidRisk, LLC v. Ogden*, 615 F. Supp. 2d 1, 7 (D. Conn. 2009) (quoting *Robert T. Reynolds Assocs., Inc. v. Asbeck*, 23 Conn. App. 247, 252, 580 A.2d 533 (1990)).

Here, it is undisputed that Cerqueira executed the signature page under the heading for Dooney and with his job title. *See* Doc. #52-14 (signed signature page) at 4 ("Dooney and Bourke" appears as the primary signer; below it is "By:___," where Cerqueira affixed his signature, then printed his name and title.). Because Dooney was the primary signer and Cerqueira signed the document as its representative, he was not personally bound by what he signed.

PMAC contends, however, that because defendants have argued that Cerqueira was unauthorized to sign the agreement, he should be held individually liable for its alleged breach. But an agent, even when acting outside the scope of his authority when signing or purportedly agreeing to a contract, does not thereby personally become a party to the contract. *See Precision Mech., Inc. v. Empyrean Hospitality*, 2007 WL 3011010, at *3 (Conn. Super. Ct. 2007); *see also*

*Sullivan v. Mancini*, 103 Conn. 110, 112–13, 130 A. 79 (1925) ("[T]he personal liability of one who contracts as agent for a named principal, without sufficient authority, is stated as follows: 'In such cases the agent is not . . . bound by the contract, because nobody intended that he should be so bound. . . .'" (quoting *Chieppo v. Chieppo*, 88 Conn. 233, 239, 90 A. 940 (1914))). Regardless of Cerqueira's authority to sign the agreement on behalf of Dooney, he cannot be held liable for breach of contract for a contract that he signed in his official capacity and to which he was not personally a party.

An agent who acts outside the scope of his authority may nevertheless be personally responsible for damages to the relying party. Liability in such circumstances may arise for the agent's breach of an implied warranty of authority or under the doctrine of deceit:

> [I]f, by reason of [the agent's] lack of authority, the contract is not enforceable against the alleged principal, the party who has been induced to contract on the faith of the agent's authority has one of two remedies. If the agent honestly believed that he had an authority which he did not possess, he may be sued on an implied warranty of authority. If he knew, or . . . he ought to have known, that he had not the authority which he professed to have, he may be sued in the action of deceit.

*Wilton Meadows Ltd. P'ship v. Coratolo*, 2010 WL 3326721, at *4 (Conn. Super. Ct. 2010) (citing *Sullivan*, 103 Conn. at 112–13); *see also* Restatement (Third) of Agency § 6.10 (2006) ("Agent's Implied Warranty of Authority").

Here, however, PMAC did not plead breach of warranty of authority or deceit in its complaint. *See* Doc. #1. I therefore decline to address whether, if it had, Cerqueira might be liable under those doctrines. *See, e.g.*, *Wilton Meadows*, 2010 WL 3326721, at *5 (distinguishing between breach-of-contract and breach-of-warranty-of-authority claims and holding that potential liability under the contract is irrelevant to the question of liability for breach of warranty of authority); *Precision Mech.*, 2007 WL 3011010, at *3 (striking a breach-of-contract

count against an agent who allegedly acted outside the scope of his authority in making a contract on behalf of a named principal, and noting without evaluating the possibility of liability if plaintiff had pled deceit or breach of implied warranty of authority).

PMAC's arguments regarding Cerqueira's actual and/or apparent authority do not speak to Cerqueira's possible liability for breach of contract. An agent's authority (actual or apparent) to bind a principal to contracts might render the principal (Dooney) liable for its breach, but not the agent (Cerqueira), unless the contracting parties agree otherwise, Restatement (Third) of Agency § 6.01 (2006), or unless the principal is not disclosed to the third party, *id.* § 6.03.

Taking the facts in the light most favorable to PMAC, as I must, Cerqueira cannot be held liable for breach of contract because he was acting on Dooney's behalf when he signed the purported agreement. Even if he exceeded the scope of his authority when he signed it, that still could not render him liable for breaching the terms of a contract to which he was not a party. I will therefore grant Cerqueira's motion for summary judgment as to the breach-of-contract and implied-contract claims.

### *Unjust Enrichment and Quantum Meruit*

"Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to a contract. . . . In order for the plaintiff to recover under the doctrine, it must be shown that the defendants were benefited, that the benefit was unjust in that it was not paid for by the defendants, and that the failure of payment operated to the detriment of the plaintiff." *Town of Stratford v. Wilson*, 151 Conn. App. 39, 49, 94 A.3d 644 (2014) (internal quotation marks and citation omitted). Similarly, the doctrine of *quantum meruit* "'arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement,'" *Gagne v. Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001) (quoting *Fischer v. Kennedy*, 106 Conn. 484,

492, 138 A. 503 (1927)), and it is "based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff." *Ibid.* Like unjust enrichment, *quantum meruit* allows a party with no contractual remedy to recover "money, services or goods of which he or she was deprived that benefited another." *United Coastal Indus., Inc. v. Clearheart Const. Co., Inc.*, 71 Conn. App. 506, 512, 802 A.2d 901 (2002).

Here, there is no evidence or even allegation that Cerqueira benefited in any way from his act in signing the agreement. I therefore grant summary judgment to Cerqueira as to his unjust enrichment and *quantum meruit* claims. *See 2 Nat. Place, LLC v. Reiner*, 152 Conn. App. 544, 559, 99 A.3d 1171 (2014) (affirming summary judgment for a defendant in part because "[t]here is no evidence [the defendant] benefited financially or otherwise. . . ." (alterations in original)).

### *Promissory Estoppel*

Promissory estoppel may serve as an alternative basis to enforce an agreement if the agreement lacks consideration or is too indefinite for a court to find that a contract has been formed. *See Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 194, 90 A.3d 219 (2014); *Glazer v. Dress Barn, Inc.* 274 Conn. 33, 88–89, 873 A.2d 929 (2005). Under this doctrine, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third party and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90(1) (1981); *Willamette Mgmt. Assocs., Inc. v. Palczynski*, 134 Conn. App. 58, 75 n.13, 38 A.3d 1212 (2012). Moreover, the promise must be "'clear and definite.'" *Ibid* (quoting *Saye v. Howe*, 92 Conn. App. 638, 648, 886 A.2d 1239 (2005)).

PMAC's promissory estoppel claim against Cerqueira is based on the theory that Cerqueira can be held accountable for a promise that Dooney would pay PMAC, thereby

inducing PMAC to perform work in reliance on that promise. There is no claim that Cerqueira promised that he himself would pay. An action for promissory estoppel, like an action for breach of contract, accrues "when the defendant fails to fulfill its promise." *Weiss v. Smulders*, 313 Conn. 227, 245, 96 A.3d 1175 (2014). Thus, any cause of action against Cerqueira could accrue only when Cerqueira failed to fulfill a promise—a senseless concept here, where the alleged promise was not one that Cerqueira was personally obligated to fulfill.

The undisputed facts make clear that Cerqueira's actions were undertaken purely in his capacity as Dooney's agent, and that anything he did outside the scope of his authority could render him liable only under breach-of-warranty and deceit doctrines. In short, Cerqueira is entitled to summary judgment as to the promissory estoppel claim for the same reasons as for the breach-of-contract and breach-of-implied-contract claims.

### *Account Stated*

Based upon the fact that PMAC sent billing statements that went unpaid, PMAC next alleges that Cerqueira should be held liable under the doctrine of an "account stated."

> A cause of action for accounts stated "centers on the obligation to pay a sum certain arising upon an examination by the parties of unsettled claims of indebtedness, and an agreement between them that all the articles are true and a particular sum remains due. This obligation may arise when there is no express promise to pay the particular sum, as where mutual claims are set off one against the other, and is a resultant balance agreed upon as due. . . . The essential and controlling factor which upon the obligation arises is an agreement between the parties that items of indebtedness, before open to dispute, are true and amount to a particular sum agreed upon as due from the defendant to the plaintiff."

*Citibank v. Gemske*, 2005 WL 3665083, at *1 (Conn. Super. Ct. 2005) (quoting *Dunnett v. Thornton*, 73 Conn. 1, 15–16, 46 A. 158 (1900)). *Prima facie* evidence of the correctness of the account exists when a plaintiff can demonstrate that statements were rendered to the defendant

11

and that the defendant retained the statements for an unreasonable time without objecting to them. *See Credit One, LLC v. Head*, 117 Conn. App. 92, 99–100, 977 A.2d 767 (2009).

It is not clear how Cerqueira first saw the PMAC account statements, which PMAC billed directly to Dooney through DeMoise. At some point, he was forwarded the statements from other confused Dooney employees. In his response to them, he acknowledged that he had apparently told Langer to pay the account, "if we get the credit from UPS. She had to check it out... I approved it for that reason. I will review with her again." Doc. #66-22 at 2.

PMAC continued to send statements to Dooney from February through April 2013 and then filed suit in May 2013; some months later, Dooney informed PMAC that it would not pay the statements. But well before then, in March 2013, Langer had expressed to PMAC her deep confusion over the invoices, explaining that she needed to "figure this all out" before she could get the statements signed, and that she was "so confused on all of this and . . . [could] not make heads/tails out of it." Doc. #52-35 at 2.

The "accounts stated" claim against Cerqueira fails from the start because he is not the appropriate defendant. PMAC's invoices were never billed to Cerqueira; they were always billed to Dooney, and there is no evidence of an agreement that Cerqueira would pay them out of his own pocket. There is simply no plausible indication of "'an agreement between the parties [Cerqueira and PMAC] . . . [regarding] a particular sum agreed upon as due from the defendant to the plaintiff.'" *Citibank*, 2005 WL 3665083, at *1 (quoting *Dunnett*, 73 Conn. at 16). Therefore, I grant summary judgment for Cerqueira as to this claim.

### *CUTPA*

The Connecticut Unfair Trade Practices Act ("CUTPA") provides in part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in

the conduct of any trade or commerce." Conn. Gen. Stat. § 42–110b(a). The following criteria determine whether a practice is unfair:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227, 990 A.2d 326 (2010) (alterations in original) (internal quotation marks and citation omitted). A contractual breach does not rise to the level of a CUTPA violation unless the action, beyond the mere breach, is unlawful or unfair as set forth above. *Id.* at 228. Even an intentional breach of contract does not amount to a violation of CUTPA absent substantial aggravating circumstances. *See Piao v. Smith*, 2014 WL 7270290, at *13 (D. Conn. 2014); *Greene v. Orsini*, 50 Conn. Supp. 312, 315, 926 A.2d 708 (Super. Ct. 2007).

Moreover, a plaintiff claiming a CUTPA violation must establish not only that a practice is unlawful or unfair, but also that it was undertaken in the conduct of trade or commerce. The trade-or-commerce requirement "focuses not only on the nature of the acts themselves, but on the relationship between the actor and the allegedly injured party," and "[i]n order for the actions to have been taken in the conduct of trade or commerce within the meaning of CUTPA, the injured party must be a consumer, competitor, or other businessperson that is harmed by the defendant's commercial business practices." *Milo v. Galante*, 2011 WL 1214769, at *10 (D. Conn. 2011). CUTPA does not apply to "activities that are incidental to an entity's primary trade or commerce." *Sovereign Bank v. Licata*, 116 Conn. App. 483, 494, 977 A.2d 228 (2009) (quoting *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc*., 93 Conn. App. 486, 523, 890 A.2d 140 (2006)). Finally, the plaintiff "'must demonstrate that she has

13

suffer[ed] any ascertainable loss of money or property, real or personal[.]'" *McLoughlin v. People's United Bank, Inc.*, 2009 WL 2843269, at *7 (D. Conn. 2009) (alteration in original) (quoting *Maguire v. Citicorp Retail Services, Inc.*, 147 F.3d 232, 238 (2d Cir. 1998)).

PMAC argues that Cerqueira should be held liable under CUTPA for his actions in allegedly cutting PMAC out of the end of the negotiation strategizing for the December 2012 UPS contract, "withholding" the renegotiated 2012 UPS agreement, and failing to pay PMAC the amount it was owed for services rendered. Doc #82 at 12. These actions do not constitute a CUTPA violation. First of all, Cerqueira ultimately did send the 2012 UPS agreement in January 2013 after it had been finalized in December 2012—not a particularly long term of "withholding," even if he did not respond to Michals's emails on January 2 and 11 before sending the new UPS agreement on January 14. *See* Doc. #66-18; Doc. #66-19; Doc. #66-20. If CUTPA were violated every time a businessperson fails to respond to emails, there would be no end to CUTPA litigation.

Second, any failure to pay PMAC boils down to a contract/quasi-contract claim, which on its own cannot establish a CUTPA violation. Third, Cerqueira's liaising with PMAC over its shipping negotiations with UPS was, at best, "incidental to [Cerqueira's] primary trade or commerce" as a software programmer for Dooney. *See Sovereign Bank*, 116 Conn. App. at 494 (internal quotation marks and citation omitted). No reasonable jury could conclude that Cerqueira violated CUTPA, and Cerqueira is entitled to summary judgment on the CUTPA claim against him.

**PMAC's Motion for Summary Judgment**

Having concluded that summary judgment should be granted for Cerqueira on all of PMAC's claims against him, I turn to PMAC's motion for summary judgment against Dooney, this time taking the facts in the light most favorable to Dooney (the nonmovant).

*Contract and Quasi-Contract Claims*

PMAC seeks to hold Dooney liable in contract for the purported agreement that was signed by Cerqueira allegedly on Dooney's behalf. Dooney may be held liable under the agreement only if Cerqueira had authority to enter Dooney into it. *See LeBlanc v. New England Raceway, LLC*, 116 Conn. App. 267, 275, 976 A.2d 750 (2009) ("[a] principal is bound to contracts executed by an agent only if it is within the agent's authority to contract on behalf of that principal" (alteration in original) (internal quotation marks and citation omitted)). Authority can be actual or apparent, and actual authority may be express or implied. *Bellsite Dev., LLC v. Town of Monroe*, 155 Conn. App. 131, at *5, --- A.3d --- (2015). PMAC argues that Cerqueira had both implied actual authority and apparent authority to contract for Dooney.

Genuine issues of fact remain for a jury to decide whether Cerqueira had either implied or apparent authority to contract with PMAC. Implied actual authority "is actual authority circumstantially proved. It is the authority which the principal intended his agent to possess. Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent." *Maharishi Sch. Vedic Sci, Inc. v. Conn. Constitution Assocs. Ltd. P'ship,* 260 Conn. 598, 607–08, 799 A.2d 1027 (2002) (alteration in original) (internal quotations marks and citations omitted). Although there is evidence that Cerqueira had some involvement in the shipping rate dealings with PMAC and UPS, other evidence reflects that he was a part-time programmer who worked largely from his

home in South Carolina and that it would not be natural for Cerqueira to be signing contracts like the one at issue in this case on Dooney's behalf. It does not appear that anyone else in the company told Cerqueira to sign the agreement or that he told anyone at the time that he had signed it.

To be sure, Dooney did not have a written policy with regard to the authority of employees to negotiate and sign contracts on the company's behalf. *See* Doc. #73-5 (Kinsley Dep.) at 9; Doc. #73-8 (Ronk Dep.) at 8. And it may be that, as PMAC argues, at least some Dooney employees were authorized to bind the company into contractual obligations without anyone else signing off. *See, e.g.*, Doc. #73-9 (Gavitt Dep.) at 11 (not true that everything went through Dooney's vice president, Kinsley, for approval). But there is insufficient evidence at this juncture to conclude that no jury question remains about the actual authority of Cerqueira to contract with PMAC on Dooney's behalf.

Nor can I find, taking the facts in the light most favorable to Dooney, that no jury question remains as to whether Cerqueira had apparent authority to act on Dooney's behalf. Apparent authority exists when a third party reasonably believes that an agent has authority to act because of a manifestation of this authority by the principal. Under Connecticut law:

> "The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action."

*LeBlanc*, 116 Conn. App. at 277–78 (quoting *Machado v. Statewide Grievance Comm.*, 93 Conn. App. 832, 838–39 n.8, 890 A.2d 622 (2006)).

A reasonable jury could find that Cerqueira did not have apparent authority to contract with PMAC on Dooney's behalf. There is no clear conduct on the part of Dooney that held

Cerqueira out as possessing authority to enter Dooney into the new PMAC contract, or that definitively establishes that Dooney knowingly permitted him to act as if he had such authority. First, there is a question of fact as to whether DeMoise (the comptroller) directed Michals toward Cerqueira: Michals's deposition and DeMoise's affidavit clash on this point. *Compare* Doc. #77-3 (Michals Dep.) at 14 ("I spoke to Kathy DeMoise . . . on the phone who directed me specifically to say that Rich Cerqueira was the person to speak with in regards to the negotiation of a new UPS agreement and also, okay, the agreement with [PMAC] to negotiate the agreement . . . . [A]t the end of the day the thing that rang true through all these conversations with Kathy was that in order to get a new UPS agreement . . . Rich Cerqueira was the person to speak to. I got Rich Cerqueira's phone number from Kathy DeMoise . . . .") *with* Doc. #77-2 (DeMoise Aff.) ¶ 7 ("I never told Mr. Michals that Mr. Cerqueira was the person in charge of negotiating a new UPS agreement . . . . Nor did I provide him with Mr. Cerqueira's telephone number.").

Second, while Langer—a Dooney accounts payable clerk—did give Cerqueira's name to Michals, even if Langer were senior enough to be considered the principal (itself disputed[1]), there is much room to question whether her mention of Cerqueira held him out as possessing permission or sufficient authority to contract on Dooney's behalf. Michals's initial email inquiry to Langer simply noted that he wanted to discuss a "facelift" for the UPS agreement; it said nothing about proposing a new contract between PMAC and Dooney. Doc. #52-10 at 2. Moreover, Langer's response did not state that Cerqueira was definitively the person to speak to about even the UPS "facelift." *Ibid* ("I think Kathy would be the one to discuss this with, or Rich

---

[1] *See* Doc. #77-2 (DeMoise Aff.) ¶ 16 ("Ms. Langer had no authority to bind Dooney nor to make any representation that Mr. Cerqueira had such authority. . . . Ms. Langer holds a clerical function within the company and her responsibilities are limited to processing of invoices from our vendors. She has no supervisory authority. She reports to . . . an accounts payable supervisor, who in turn reports to me.").

17

Cerqueira. Kathy is on vacation till Monday. I will bring this up with her and let you know the outcome.").

It is similarly far from clear that Michals had a good-faith, reasonable belief that Cerqueira had the authority to bind Dooney. Michals knew that Cerqueira was a software programmer. And Cerqueira even allegedly told Michals that he had no authority to bind Dooney. *See* Doc. #73-7 (Cerqueira Dep.) at 9 (Cerqueira testified that he said "Okay, I can sign this but it doesn't mean anything because I'm not an officer of the company."). Furthermore, after Cerqueira returned the signature page to PMAC, no one from PMAC ever again mentioned the new contract to Cerqueira or to any other Dooney employee, throughout all of PMAC's work with Dooney on the UPS negotiation. A reasonable jury could find that PMAC did not act in good faith and did not reasonably believe Cerqueira had the authority to contract with PMAC on Dooney's behalf.

"The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996); *see also Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 544, 893 A.2d 389 (2006) ("[T]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn." (internal quotation marks omitted)). This case is full of factual questions about Cerqueira's role in signing a contract that perhaps no one but Cerqueira and PMAC realized existed. Those factual questions preclude summary judgment as to PMAC's breach-of-contract and breach-of-implied-contract claims against Dooney, which turn at the outset on the authority of Cerqueira to contractually bind Dooney when he signed the purported agreement on Dooney's behalf.

I will therefore deny PMAC's motion for summary judgment as to the breach-of-contract and implied-contract claims.[2] And because only in the absence of an enforceable contract can a party recover under the doctrines of unjust enrichment, *Wilson*, 151 Conn. App. at 49, *quantum meruit*, *United Coastal Indus.*, 71 Conn. App. at 513, and promissory estoppel, *Meadowbrook Ctr.*, 149 Conn. App. at 194, I will deny PMAC's motion for summary judgment as to those quasi-contract claims as well.

*Account Stated*

There is no dispute that PMAC submitted invoices to Dooney beginning in February 2013, and was given notice by Langer's confused email in March 2013 that Dooney already had serious concerns about them (in fact "[could] not make heads/tails out of [them]") and would "have to let them wait" to be resolved. Doc. #52-35 at 2. A reasonable jury could find that Dooney did not retain the invoices for an unreasonable time without disputing them. I cannot find as a matter of law that PMAC is entitled to summary judgment on this claim.

*CUTPA*

The CUTPA claim against Dooney is barely stronger than against Cerqueira. The offending acts allegedly consisted of "withholding" the renegotiated 2012 UPS agreement and failing to pay PMAC for its services. Doc. #81-1 at 37. "Withholding material information" is one of the four categories of unfair practices prohibited by CUTPA. *See A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 216 & n.9, 579 A.2d 69 (1990). Dooney's "withholding" allegedly occurred during the period in which Michals was inquiring about but not yet receiving the renegotiated 2012 UPS agreement—a period from December 4, when Michals emailed Scott

---

[2] Additionally, an implied contract can be found only where there is no express one, *Janusauskas v. Fichman*, 264 Conn. 796, 804, 826 A.2d 1066 (2003), so I cannot grant PMAC's summary judgment as to its implied contract claim unless and until it is established that there was no enforceable express contract between the parties.

19

Gavitt to no avail, Doc. #66-17 at 2, to January 14, when Cerqueira sent him the new agreement. Doc. #52-30 at 2. There are three unanswered emails in the record during that period, which also coincided with the holiday season. As for the failure to pay PMAC, that dispute—a contract and quasi-contract dispute with a consultant—is "incidental to [Dooney's] primary trade or commerce," *see Sovereign Bank*, 116 Conn. App. at 494 (internal quotation marks and citation omitted), and does not present the sort of substantial aggravating circumstances that would elevate the claim from contract/quasi-contract to CUTPA. *See Piao*, 2014 WL 7270290, at *13. This is frankly not the type of egregious trade practice CUTPA was designed to punish.

Finally, PMAC argues in its brief that when this suit began, Dooney "engaged in a series of calculated deceptions that caused PMAC to unnecessarily incur attorneys' fees and delayed resolution of this action." Doc. #81-1 at 37. These allegations appear nowhere in the complaint, and PMAC provides no evidence to support them on summary judgment. PMAC's motion for summary judgment will be denied as to its CUTPA claim.

## CONCLUSION

Defendant Cerqueira's motion for summary judgment (Doc. #49) is GRANTED in full, and judgment shall enter in his favor on all claims against him. The Clerk of Court shall dismiss Richard Cerqueira as a defendant in this case. PMAC's motion for summary judgment (Docs. #53, #81) is DENIED on all claims. The parties shall file joint trial memoranda by March 30, 2015, and contact chambers concerning the scheduling for trial.

It is so ordered.

Dated at Bridgeport this 25th day of February 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge